SWIFT, Judge.
In these two consolidated suits[1] Daisy LaCour, her daughter, Conchita LaCour, and Charles Williams seek to recover damages for personal injuries allegedly sustained on December 5,1980, when struck by a ceiling tile that fell during a bingo game at the Elks Club in Natchitoches. The defendants are St. Paul Fire and Marine Insurance Company (St. Paul), the liability insurer of the owner-lessor of the building,[2] and the Benevolent and Protective Order of the Elk, No. 1363, (Elks), the lessee. Each defendant filed a third party demand against the other. From a judgment rejecting Conchita LaCour’s and Charles Williams’ demands, but awarding Daisy La-Cour judgment in the sum of $4,352.90 against St. Paul only, the plaintiffs have appealed.
It is undisputed that a single piece of tile fell from the ceiling in the area of the building where the three plaintiffs were seated playing bingo. However, the testimony of the persons who were at or near the scene conflicted in many respects.
Daisy LaCour testified that the building which had a high ceiling was crowded and she was sitting near the end of one of the rectangular tables with Conchita close to her left. The dimensions of the tile were approximately one and one-half feet by two feet and it was heavy. Daisy was struck on the back of her head and neck and then the tile struck Conchita. She later learned that it also hit the people at the table behind her. Daisy continued to play bingo for a few minutes after being hit, but she left before the game was over because her neck and back began to hurt worse.
Conchita LaCour stated that a large piece of ceiling tile hit her on the back of the head and neck. She just sat there stunned and did not play her cards any more. They left approximately 10 or 15 minutes after the incident, about the same time as the bingo was over.
Charles Williams testified that the building was crowded. The LaCours were sitting at the table to his rear within “hand reach of them.” The ceiling was approximately 25 to 35 feet high and the tile was three to four feet long, about two or two and a half feet wide and from five-eighths to one inch thick. The tile struck him on the left side of his neck and across the shoulder. He was almost knocked out and remained seated to regain his composure. The bingo game continued, but he did not play. He did not see the tile hit anyone else, because he was playing his bingo cards when struck.
Wilson Cedars, the chairman of the bingo committee, testified that the Elks had not changed the ceiling after occupying the building. He had no prior warning that the tile was going to fall. The tables where the plaintiffs were sitting were approximately six feet apart and the space between the people at the tables was approximately two or two and one-half feet apart. When the tile fell from the ceiling, it descended in a flat position parallel to the floor. When he arrived at the scene the people who claimed to have gotten hit were arguing as to who was struck. No one indicated they had been hurt. The tile was light in weight and the people resumed playing the game. The bingo lasted about an hour and a half thereafter.
Winston Cedars, the son of Wilson Cedars, testified they had no prior warning as to the condition of the tile. He saw it strike a lady. Thereafter “the top of it fell and hit the man against the head and then fell between the chairs.” Cedars did not see any other female get hit. He stated that the tile was in an edgewise position when it struck the lady. This witness estimated the distance between the LaCours and Mr. Williams as approximately two and *1382 one-half to three feet. He believed the people involved in the incident continued to play bingo until it was over.
Willie Gongre, the manager of the Elks Club, testified that he inspected the premises every day and did not know there was any thing wrong with the ceiling until the tile fell. He went with a policeman to investigate the occurrence and noticed Mr. Williams had his hand on the middle of his back below the neck, but he did not indicate that he was in any pain. No lady complained about being hurt. Williams continued to play bingo. Gongre did not see him or any of the ladies leave until the bingo was over for the evening. He stated that he picked up the tile and it was light in weight. Gongre thought the bingo lasted about an hour and 15 minutes after the accident.
Paul Cardino, a carpenter by trade who was at the bingo game, testified that he went to the tables when the tile fell and heard no complaints of injury from anyone that had been hit. He believed everyone continued playing bingo. The game ended about an hour after the tile fell. Cardino also stated that he measured the tile several days later and found it was 14 inches wide, 32 inches long and one-half inch thick. The tile was made of lightweight Celotex material. He also measured the height of the ceiling to the floor, which was 13 feet three inches.
Addie Hardison testified that she was seated on Daisy LaCour’s left and saw the tile strike Daisy, her daughter and then another man. She said that Conchita was sitting on her mother’s right and that the tile hit the LaCours at the same time. It was a hard hit.
Brenda Williams, the wife of plaintiff, testified that she noticed the tile hanging from the ceiling when she entered the building, but she did not warn her husband. She saw the falling tile hit Williams on the back of his head and that it also struck two other people. It fell during the last game of the evening. They left and went to the hospital about five or ten minutes later.
All three plaintiffs went to the emergency room of the Natchitoches Parish Hospital that night and subsequently sought further medical attention.
Daisy and Conchita LaCour were seen the next morning by their family physician, Dr. Charles Cook. He did not testify, but apparently recommended that they see an orthopedist.
Dr. Baer I. Rambach, a Shreveport orthopedist, saw Daisy LaCour on December 16, 1980, and noted limitation of motion and moderate muscle spasms in her cervical spine region. The xrays and neurological examinations revealed no abnormalities. He recommended the plaintiff continue to wear a cervical collar, take mild analgesics and use moist heat intermittently. On January 6 she returned with the same complaints. The physician again noted limitation of motion in the cervical spine and recommended a physical therapist, some traction and exercises. Dr. Rambach last saw Mrs. LaCour on June 11,1981. He said that she still had limitation of neck motion and complained of pain and discomfort. New xrays revealed no significant changes. Dr. Rambach recommended that she continue with her exercises. He felt that the plaintiff was unable to teach from the date of the accident until the end of the semester in May, 1981. However, he opined that she would be able to resume her teaching duties in September, 1981.
Dr. Rambach also examined Conchita LaCour on December 16, 1980. He noted some tenderness in the back part of her head and neck. The xrays were negative. The doctor noted no bruises and said that his diagnosis of contusions to the back of the neck was based on the history given to him by the patient. He prescribed moderation of activities, aspirin or bufferin and moist heat to any tender areas. A full recovery was expected in six to 12 weeks.
Dr. Fresh, an Alexandria neurosurgeon, testified that he examined Conchita on February 9, 1981, for complaints of headaches and blurred vision. He diagnosed her condition as a mild head injury with post traumatic headaches, although there was no *1383 physical evidence of a trauma. The results of his tests were all within normal limits. He said that this type of headache is generally resolved within six months.
Charles Williams testified that he visited the Tioga Medical Clinic on December 6, 1981, because they had been treating him for sickle cell anemia and a previous back injury. He did not want to go into another life threatening “crisis” as he had in 1977 with his back injury. He stated that in this instance “the doctors got to it in time” and he did not have any such problem. “What I went in the hospital for was strictly for my neck not no sickle cell.”
The medical exhibits reveal that Williams was admitted to the Doctors’ Hospital of Tioga on December 6, 1980, complaining of neck pain and was finally discharged on December 16, 1980.
Dr. Robert K. Rush, a family practice specialist who had treated the plaintiff before, testified that Mr. Williams had a sickle cell crisis following a lumbar back strain in 1977 and nearly died. Thereafter he continued to have muscle spasms with restriction of motion in his back and neck for which he was taking the same medication they prescribed after the December 5, 1980, incident. Upon admission to the hospital on December 6 Williams was first seen by a Dr. Rudd and then by Dr. DeFee. His condition was diagnosed as an acute cervical strain. The xrays were negative. Dr. Rush did not know whether the plaintiff would have any residual from this accident, but he said that it did not take much to aggravate sickle cell anemia and bring on a crisis. This doctor also saw Williams on January 6 and 28, 1981, for similar muscle spasms and restriction of motion.
Dr. William J. DeFee, a family practitioner and Dr. Rush’s partner, said that on December 8 Williams complained of neck pain and had a sickle cell crisis with a hemoglobin of 8.8 grams per cent. This was consistent with his long standing sickle cell anemia. He thought the December 5, 1980, trauma could have accelerated or aggravated his sickle cell problem. However, neither Dr. Defee nor Dr. Rush testified as to just what aggravation may have occurred or what symptoms arose therefrom.
According to the trial judge’s written reasons for judgment:
“These conolidated cases are before the Court on petitions by CHARLES WILLIAMS, DAISY LACOUR and CONCHI-TA LACOUR in which they seek money damages as a result of personal injuries they allege to have sustained on December 5, 1980, when a 14 inch by 32 inch celotex (or some similar material) ceiling tile fell on their heads. They were seated at tables playing bingo when the tile fell from a 13 foot 3 inch ceiling. The Court concludes that the distance from the ceiling to the tips of their heads (the length of the fall) was approximately ten feet. The Court further concludes, from the non-specific evidence about the weight of the tile, that it was about the weight of a Sunday ‘New Orleans Times Picayune.’ All three plaintiffs claim they were the victim of a direct hit and the other (and apparently less injured) plaintiffs received only ricochet damage. The testimony indicates that the first point of contention on the night of the incident was between the plaintiffs as to who took the direct hit. However, they apparently did not argue long because the final bingo game of the night at this Elks Club sponsored bingo game was about to begin and since it had the biggest ‘pot’, all of the plaintiffs stayed for it. At the conclusion of the final bingo game all of the plaintiffs rushed to the emergency room of the Natchitoches Parish Hospital with neck complaints and thereafter saw a series of physicians with complaints running the gamut from bruises, whip lash and stiff neck to traumatic neurosis and aggravation of sickle cell anemia.
“The Court simply does not believe that three adults could sustain such severe injuries as a result of one 14 inch by 32 inch Celotex Ceiling Tile falling a distance of 10 feet. The evidence herein preponderates toward a finding, and the Court so concludes, that the tile struck DAISY LACOUR when it fell and if it *1384 struck CONCHITA LACOUR and CHARLES WILLIAMS at all, it was with insufficient force to cause injury and their claims are rejected.
“The Court is of the opinion that DAISY LACOUR sustained minimal physical injuries for which she should be compensated, but neither the medical depositions nor the personal testimony at trial indicate any serious, long term or disabling injury. The testimony indicates MRS. LACOUR already had planned a leave from her teaching duties for rest and recuperation and the Court does not believe, nor does the medical evidence indicate, that this slight blow should have disabled her for any period of time beyond a few hours, and certainly not for a period of six or seven months. MRS. LACOURS’ claim for lost wages is rejected.”
Liability of the insurer of the owner-lessor for the damages proved is rather clear. LSA-C.C. Article 2322 imposes liability upon the owner-lessor of a building to persons injured through its “ruin” whether caused by a vice in its original construction or through his neglect to repair it.
As the Supreme Court stated in Olsen v. Shell Oil Co., 365 So.2d 1285 (La.1978):
“The owner’s fault is founded upon the breach of his obligation to maintain or repair his building so as to avoid the creation of undue risk of injury to others. The owner is absolved from its strict liability neither by his ignorance of the condition of the building, nor by circumstances that the defect could not easily be detected. He is absolved from such liability only if the thing owned by him falls, not because of its defect, but rather because of the fault of some third person or of the person injured thereby, or because the fault is caused by an irresistible cause or force not usually foreseeable. Article 3556(14), (15), (usually, an act occasioned exclusively by violence of nature without the interference , óf or contribution by any human agency).
“See: Klein v. Young, 163 La. 59, 111 So. 495 (1927); Thompson v. Commercial National Bank, 156 La. 479, 100 So. 688 (1924); Barnes v. Beirne, 38 La.Ann. 280 (1886); Camp v. Church Wardens, 7 La. Ann. 321 (1852), Crawford v. Wheless, 265 So.2d 661 (La.App. 2d Cir., 1972); Anslem v. Travelers Insurance Company, 192 So.2d 599 (La.App. 3d Cir., 1966); Green v. Southern Furniture Company, 94 So.2d 508 (La.App. 1st Cir., 1957); Comment, 42 Tul.Law Rev. 178 (1967).
“Under the terms of Article 2322, several requirements for the imposition of liability under the article must be met: (1) There must be a building; (2) the defendant must be its owner; and (3) there must be a ‘ruin’ caused by a- vice in construction or a neglect to repair, which occasions the damage sought to be recovered.
Under the circumstances of this case we find that the loose ceiling tile, either from dry rot or faulty nailing, constituted a “ruin” within the meaning of Article 2322 and that St. Paul, as the liability insurer of the owner-lessor, is liable for any injury occasioned by the neglect to repair such condition.
Needless to say, this court is not entitled to substitute its findings of fact for the reasonable evaluations of credibility and reasonable inferences of fact made by the trial judge who heard the witnesses and evaluated their testimony. It is obvious from its reasons for judgment that the court was not impressed by the plaintiffs’ testimony and was convinced they were exaggerating their injuries. We must admit it seems incredible that these parties were injured to the extent they and their doctors claim by the ten foot fall of this lightweight piece of Celotex ceiling tile. However, we cannot completely disregard the testimony of other witnesses that all three plaintiffs were actually struck by the tile and the uncontradicted medical evidence that each of them sustained a mild neck injury as a result thereof. We certainly agree with the trial court’s determination that the injuries suffered by the plaintiffs were not severe, but we must conclude that they were actually injured by the falling tile and that each *1385 plaintiff is entitled to compensation for those injuries.
Conchita LaCour’s medical expenses totaled $371.50. The testimony of her treating physicians indicates there were no objective signs of injury to her head or neck, but each concluded that she did suffer a mild head injury based on the history and complaints stated by the plaintiff. Under these circumstances we feel that an award of $750.00 for general damages and $371.50 in special damages is sufficient.
Charles Williams’ doctors found that he sustained a neck injury, but they were principally concerned with his pre-existing sickle cell anemia and the possibility that the trauma might bring on a dangerous crisis. Dr. DeFee said that Williams was in a crisis when he first saw him, but the plaintiff testified that he did not experience any such problem in the hospital. If he did the symptoms must not have been of any great significance. All things considered, we believe that an award of $1,500.00 for pain and suffering plus his medical expenses of $2,836.40 would adequately compensate Mr. Williams for his injuries.
Daisy LaCour contends that the award of $3500 for her general damages is inadequate and that the judge erred in rejecting her claim for lost wages. Of course, it is well settled that an appellate court may not disturb a trial court’s award of damages unless the record clearly reveals that the trier of fact abused its discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); and Smith v. Hartford Accident & Indemnity Co., 399 So.2d 1193 (La. App. 3 Cir. 1981), writ denied, 406 So.2d 604 (La.1981). We are unable to find that the trial court abused its discretion as to the amount awarded for general damages. In regard to her claim for lost wages, we agree with the trial judge that none are due this plaintiff for the period covered by her sabbatical leave which began January 19,1981. She definitely had made her plans before the December 5 accident to take this leave from her duties as a school teacher for rest and recuperation from a knee condition. Consequently, she was not deprived of any sick leave or wages because of the Elks Club incident. She is entitled to recover, however, the amounts deducted from her pay to hire a substitute teacher before her leave began. We gather from her testimony that $21.00 per day was deducted from her check for 13 school days in December and $28.00 was deducted for each of the nine days she missed from school in January. Thus, she lost $525.00 in wages as a result of the falling ceiling tile and Daisy LaCour’s judgment will be amended to add this sum to her award.
For the foregoing reasons, that part of the judgment of the district court which rejected Conchita LaCour’s demands is reversed and judgment is hereby rendered in favor of Conchita LaCour against St. Paul Fire and Marine Insurance Company in the sum of $1,121.50 with legal interest thereon from date of judicial demand until paid. That part of the judgment in favor of Daisy LaCour against St. Paul Fire and Marine Insurance Company is amended to increase her award to $4,877.90 with legal interest thereon from date of judicial demand until paid. Otherwise, the judgment is affirmed. All costs of court, including this appeal, are assessed against St. Paul and Marine Insurance Company.
REVERSED AND RENDERED IN PART AND AMENDED AND AFFIRMED IN PART.

. Williams v. St. Paul Fire and Marine Insurance Company, et al., 417 So.2d 1385, and this case.

. H. L. Hughes, the owner-lessor, was originally joined as a defendant in the Williams case. He died after the suit was filed and his heirs were substituted in his place. However, the action was dismissed as to such parties when insurance coverage was stipulated.